IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| ANAGRAM HOLDINGS, LLC, *et al.*,[1] | Case No. 23-90901 (MI) |
| Debtors. | (Joint Administration Requested) (Emergency Hearing Requested) |

**DECLARATION OF AJAY BIJOOR IN SUPPORT OF DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO (A) OBTAIN POSTPETITION FINANCING; (B) USE CASH COLLATERAL, AND (C) GRANT LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (II) GRANTING ADEQUATE PROTECTION TO CERTAIN PREPETITION SECURED PARTIES, (III) MODIFYING THE AUTOMATIC STAY, (IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF**

Pursuant to 28 U.S.C. § 1746, I, Ajay Bijoor, hereby declare as follows under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1. I am a Managing Director of the Capital Structure Advisory Group at Robert W. Baird & Co. Incorporated's ("Baird") Global Investment Banking group, with principal offices located at 1155 Avenue of the Americas, New York, NY 10036. The debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors") are proposing to retain Baird as their investment banker in these chapter 11 cases.

2. Except as otherwise indicated, all facts set forth in this declaration (this "Declaration") are based upon my personal knowledge of the Debtors' operations and finances,

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Anagram Holdings, LLC (8535); Anagram International, Inc. (2523) and Anagram International Holdings, Inc. (5837). The location of the Debtors' service address for purposes of these chapter 11 cases is: 7700 Anagram Drive, Eden Prairie, MN 55344. For the avoidance of doubt, the Debtors' chapter 11 cases are not proposed to be consolidated with Party City Holdco Inc. and its affiliate debtors (collectively, "Party City") which emerged from chapter 11 cases in this Court on October 12, 2023. *See In re Party City Holdco Inc., et. al.,* Case No. 23-90005 (MI) (Bankr. S.D. Tex). Any reference herein to the Debtors does not include the debtor-entities that were administered in the Party City chapter 11 cases.

information learned from my review of relevant documents, and information supplied by members of the Debtors' management, the Debtors' other advisors and Baird professionals working directly with me or under my supervision, direction or control who are involved in advising the Debtors. I am over 18 years of age and authorized to submit this Declaration. If called upon to testify, I could and would testify competently to the facts set forth herein on that basis.

3. I submit this Declaration, on the Debtors' behalf, in support of the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief;* (the "DIP Motion"; and the orders entered by the Bankruptcy Court pursuant thereto, the "DIP Orders").[2]

## Qualifications

4. I am a Managing Director at Baird, which I joined in 2022. Baird is a leading middle-market investment bank with over 400 investment banking professionals globally. I lead Baird's Capital Structure Advisory Group, which provides advice to clients facing complex balance sheet issues.

5. I have over 23 years of investment banking and corporate finance experience, including over 17 years of restructuring-related investment banking experience (both in and out of court) across a wide range of industries, including with respect to financings and mergers and acquisitions. Prior to joining Baird, I was a Managing Director in the Debt Advisory and

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the DIP Orders or the First Day Declaration (as defined below), as applicable.

2

Restructuring practice of DC Advisory where I focused on advising on restructuring matters from 2020 to 2022. Prior to that, I was a Managing Director in the Restructuring Group at Guggenheim Securities, LLC, an investment banking and financial advisory firm, for four years. I also spent several years as a senior restructuring banker at Peter J. Solomon Company and Miller Buckfire & Co. I received a Bachelor of Arts degree in Economics from the University of Pennsylvania in 1998 and a Master of Business Administration degree from The Wharton School at the University of Pennsylvania in 2006.

6. In addition to working with the Debtors in the above-captioned chapter 11 cases, my experience includes representing companies, boards, creditors, and other stakeholders in a variety of restructuring situations across a broad range of industries, including with respect to the chapter 11 cases of: Basic Energy Services; Charming Charlie; Dana Corporation; The Dolan Company; Energy Future Holdings; Hornbeck Offshore Services; Lear Corporation; Mattress Firm; Meridian Technologies; Overseas Shipholding Group; Quiksilver; Templar Energy; White Star Petroleum; and Station Casinos, among others.

## **Baird's Retention**

7. Baird has been engaged as investment banker to the Debtors, and members of my team and I have been working closely with the Debtors, since July 2023. Since being engaged by the Debtors, Baird has rendered investment banking advisory services to the Debtors in connection with the Debtors' evaluation of certain strategic alternatives, including a potential sale, preparations for potential chapter 11 cases, and outreach to potential liquidity providers to obtain postpetition financing. Additionally, Baird has worked closely with the Debtors' management and other professionals retained by the Debtors with respect to these strategic alternatives and has

become acquainted with the Debtors' capital structure, liquidity needs, and business operations. As a Managing Director, I am responsible for the day-to-day activities of the Baird deal team.

## The Debtors' Need for Postpetition Financing

8.  I understand that information regarding the Debtors' cash needs leading up to the Petition Date and the need for the relief requested in the DIP Motion are addressed in the *Declaration of Adrian Frankum in Support of Debtors' Chapter 11 Petitions and First-Day Motions* (the "First Day Declaration"), filed contemporaneously herewith.

9.  I believe that access to the DIP Facilities (as defined below) and Cash Collateral is essential for the following reasons: *First,* based on discussions with the Debtors and their financial advisor, Ankura Consulting Group, LLC ("Ankura"), I understand that the Debtors require access to the DIP Facilities to preserve their assets and maintain operations during the Sale Process in order to maximize recovery for their stakeholders (including the Debtors' creditors). Indeed, I understand that, according to the Debtors' cash flow projections prepared by Ankura, the Debtors commenced these chapter 11 cases with insufficient cash on their balance sheets to pay ongoing business expenses and the cost of administering the Sale Process.[3] Accordingly, without access to the DIP Facilities and Cash Collateral, the Debtors would likely have to curtail operations, which would be value destructive and, as I understand, could trigger a default under the stalking horse asset purchase agreement annexed to the Bidding Procedures Motion (the "Stalking Horse APA").

10.  *Second*, based on my experience, I believe that access to the proposed DIP Facilities and use of Cash Collateral will signal to the market, including the Debtors' customers and vendors, as well as the Debtors' employees, that the Debtors' can and will continue operating during these

---

[3] The current cash flow projections are set forth in the Initial DIP Budget attached to the interim DIP Order as **Schedule 1**. The cash flow projections are subject to revisions and change and are not a guarantee of actual disbursements or receipts.

4

chapter 11 cases without interruption. I believe that stabilizing the Debtors' business is critical to a successful sale process. Based on my experience, I believe that potential purchasers are more likely to bid, and bid at a higher price, if the Debtors are operating in the ordinary course without a loss of vendors, employees or customers. It is therefore important to show those constituents that the Debtors have sufficient liquidity through the DIP Facilities and use of Cash Collateral.

## Efforts to Obtain Postpetition Financing

11. Since July 2023, Baird has worked with the Debtors and the Debtors' management and other advisors to evaluate strategic alternatives for the Debtors. Ultimately, the Debtors, in consultation with their advisors, concluded that the most viable and value-maximizing alternative for the Debtors and their estates is a sale of substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code (the "Sale Process").

12. Once the Debtors concluded a chapter 11 proceeding was likely, the Debtors immediately looked to secure debtor-in-possession ("DIP") financing on the best available terms. The Debtors, with the assistance of their advisors, evaluated their cash flow and liquidity needs to operate their businesses and pay the expenses of a chapter 11 process while effectuating a going concern sale. The Debtors also assessed whether they had any material unencumbered property to secure any new financing, but my understanding is that the Debtors' existing Noteholders and the Prepetition ABL Lender have liens on substantially all material assets.

13. Because of the existing secured creditors' liens, the Debtors began their efforts to obtain DIP financing by engaging with their existing secured creditors, including the Prepetition ABL Lender and an ad hoc group (the "Ad Hoc Group") who, I understand, collectively holds approximately 60% in principal amount of First Lien Notes. My understanding is that, under the prepetition Indentures and the Intercreditor Agreements, the members of the Ad Hoc Group can

consent to priming liens on what is referred to as the "Notes Priority Collateral", which is the pool of collateral consisting of "fixed assets" such as property, plant and equipment. Similarly, the Prepetition ABL Lender can consent to priming liens on the "ABL Priority Collateral", which includes receivables and inventory. Both the Ad Hoc Group and the Prepetition ABL Lender informed the Debtors that they will not consent to any priming liens over their collateral to secure third-party DIP financing. In my opinion, seeking non-consensual priming liens on the Notes Priority Collateral or the ABL Priority Collateral would risk destabilizing the Debtors' operations and the Sale Process at the outset of these chapter 11 cases, with no assurance the Debtors could ultimately succeed if they undertook a priming fight.

14. As a result, the Debtors determined that any financing proposals predicated on non-consensual priming liens were not viable and, instead, the Debtors, with the assistance of Baird and their other advisors, focused their efforts on obtaining DIP financing from the Ad Hoc Group and the Prepetition ABL Lender on the best possible terms. After weeks of good faith, but often hard-fought, negotiations, the Debtors and the Ad Hoc Group agreed on the terms of a fully committed $22 million debtor-in-possession notes facility (the "DIP Notes Facility" and the notes thereunder, the "DIP Notes"). Once the terms were finalized, another First Lien Noteholder also agreed to participate on equal and ratable terms as the Ad Hoc Group (collectively, in their capacities as such, the "DIP Noteholders"). As a result, almost 100% of the First Lien Noteholders now are funding the DIP and consenting to the priming liens. To further bolster their liquidity, the Debtors also secured a commitment from the Prepetition ABL Lender to allow the Debtors to have continuous access to the Debtors' existing $15 million Prepetition ABL Facility after the Petition Date, subject to certain modifications that are set forth in the DIP Orders (as so modified, the "DIP ABL Facility").

15. Importantly, the DIP Notes Facility is coupled with, and conditioned on, a Stalking Horse Bid for substantially all of the Debtors' assets. The Stalking Horse Bid submitted on behalf of the First Lien Noteholders and DIP Noteholders includes (i) a credit bid for all of the First Lien Notes[4] and DIP Notes, *plus* (ii) cash in an amount sufficient to repay the DIP ABL Facility and fund a minimum amount of wind down expenses of the Debtors' estates *plus* (iii) assumption of the material liabilities. The Stalking Horse Bid provides significant benefits to the Debtors. By entering into a Sale Process with a Stalking Horse Bid, as compared to an open auction, the Debtors establish a more certain outcome, set a floor on the value of their estates, resulting in a higher chance of receiving the most value for their assets, and ensure a more expeditious Sale Process. The Stalking Horse Bid also includes a credit bid of the DIP Notes, reducing administrative expenses owed by the Debtors. However, I understand that the DIP Noteholders and the Ad Hoc Group coupled their Stalking Horse Bid with the DIP Notes Facility, providing the Debtors a comprehensive path forward.

16. Notwithstanding that the Debtors received the DIP financing proposals from the Ad Hoc Group and the Prepetition ABL Lender, the Debtors, with the assistance of Baird, engaged in a comprehensive marketing process with potential alternative DIP financing providers. In particular, the Debtors focused on an upsized asset-based lending financing facility that would be sufficient to refinance the Prepetition ABL Facility in full, thereby avoiding a priming fight, *and* provide the Debtors with additional liquidity. In all, 39 potential third-party DIP financing providers, consisting of traditional asset-based lenders and credit funds, were contacted to explore viable alternatives.

---

[4] Because the members of the Ad Hoc Group hold approximately 60% of the principal amount of First Lien Notes, they have the requisite holdings to direct the First Lien Notes Trustee to credit bid the full amount of outstanding First Lien Notes.

17. Of the potential DIP financing providers contacted, 19 signed non-disclosure agreements and were given access to a data room with additional materials to guide their decision-making processes, including a detailed request for proposal, and 7 submitted indications of interest. The Debtors, with the assistance of Baird and their other advisors, engaged in multiple rounds of negotiations with such potential DIP financing providers and suggested alternative terms to make such DIP financing proposals more competitive. During this process, the Debtors continued to negotiate improved terms from their existing secured creditors.

18. After reviewing all alternatives available to it and evaluating those proposals based on, among other things, access to liquidity, cost of capital, covenants, conditions, certainty of execution, and risk of challenge, the Debtors determined that the DIP Notes Facility and DIP ABL Facility together provided the most favorable economic terms and allowed for most certainty in the Sale Process.

### The DIP Facilities Were Negotiated in Good Faith and Arm's Length

19. Negotiations over the Debtors' proposed DIP financing were conducted over many weeks all the way to the Petition Date, in good faith and at arm's length. During these negotiations, the Debtors, the DIP Noteholders and the Prepetition ABL Lender were all represented by their own experienced advisors and the parties exchange multiple proposals and counterproposals.

20. Through the Debtors' negotiations with the DIP Noteholders and the Prepetition ABL Lender, the economics and other terms of the DIP Facilities improved to the benefit of the Debtors from the terms originally proposed, including, but not limited to, improved economic terms and less restrictive covenants.

**The Terms of the DIP Facilities**

21. Baird assisted the Debtors in their review of the principal economic terms of the proposed DIP Facilities. The terms of the DIP Facilities are detailed in the DIP Motion, as well as in the DIP Notes Documents, the DIP ABL Agreement and the Prepetition ABL Loan Documents. As described in the DIP Motion, the DIP financing contemplates both (a) the DIP Notes Facility in an aggregate principal amount of up to $22 million, of which $10 million will be available immediately upon entry of the interim DIP Order, and the remainder will be available subject to and upon the date of entry of the final DIP Order and (b) the DIP ABL Facility in an aggregate principal amount of up to $15 million, which provides for a gradual roll-up, whereby the prepetition ABL Facility will be paid down by collections on receivables but the Debtors can continue to borrow under the DIP ABL Facility.

22. The unpaid principal amount of the DIP Notes accrue interest at a rate equal to 13.00% per annum, payable in cash monthly. Under the DIP Notes Facility, there is a commitment fee of 5.0% of the total DIP Notes commitments, payable to each committing DIP Noteholder.

23. The unpaid principal amount of obligations outstanding under the DIP ABL Facility accrue at a rate equal to the daily simple SOFR *plus* 4.50% per annum, payable monthly in cash. The fees payable under the DIP ABL Facility include a $200,000.00 commitment fee due and payable within two business days following entry of the interim DIP Order.

24. I believe that the interest and fees under the DIP Facilities that are described in the DIP Motion, including the 5.0% commitment fee, are, in the aggregate, in light of the marketing process described above and my involvement in the negotiation of the key economic terms of the DIP Facilities, appropriate under the circumstances. The proposed fees are consistent with the range of fees I have seen in similar financings in which I have been involved, particularly in light

9

of the financial condition of the Debtors as described in the First Day Declaration and the DIP Motion. These fees were the subject of negotiations between the Debtors and the DIP Noteholders and the Prepetition ABL Lender, respectively, are an important component of the overall terms of the DIP Facilities, and were required by the DIP Noteholders and the DIP ABL Lender as consideration for the extension of postpetition financing.

25. Additionally, based on the discussions I observed, the gradual roll-up of the obligations under the Prepetition ABL Facility pursuant to the interim DIP Order was an important component of the DIP ABL Facility that the DIP ABL Lender (through its representatives) required as a condition to provide the Debtors with the DIP ABL Facility and to consent to the Debtors' use of Cash Collateral. It is my understanding that the DIP ABL Lender would not be willing to permit continued borrowing under its facility or use of Cash Collateral absent this feature. Notably, however, as described in the DIP Motion, notwithstanding the roll-up feature, there will be a period of time during which the claims and liens related to the Prepetition ABL Facility will be subject to review.

26. In sum, based on my experience with DIP financing transactions as well as my involvement in the marketing and negotiation of the postpetition financing alternatives for the Debtors, I believe that the DIP Facilities are the best financing option presently available to the Debtors under the circumstances, for several reasons:

27. *First*, the DIP Facilities will provide the Debtors with access to the amount of capital that the Debtors, in consultation with their advisors, believe is necessary to effectively and efficiently conduct the Sale Process and administer these chapter 11 cases, including at least eight weeks of liquidity sufficient for the Debtors to operate their business in chapter 11 and fund a sale process.

28. ***Second,*** the terms of the DIP Facilities are the result of the above-described marketing process. As set forth above, the Debtors, with the assistance of their advisors, including Baird, solicited and considered other sources of postpetition financing to determine whether the Debtors could obtain DIP financing on better terms and engaged in discussions with multiple third parties. Notably, none of the other Noteholders or third-party lenders from outside of the Debtors' existing prepetition capital structure that were contacted in connection with the marketing process were willing to provide the Debtors with actionable DIP financing on more favorable terms.

29. ***Third***, as part of the DIP Notes Facility proposal, the DIP Noteholders committed to credit bid the DIP Notes Facility and the First Lien Notes as part of the Stalking Horse Bid, in support of the Debtors' efforts to maximize the value of the Debtors' estates.

30. In sum, for the reasons set forth above, I believe that the principal economic terms proposed under the DIP Facilities (such as the contemplated pricing, fees, interest rate, and default rate) are customary and usual for DIP financings of this type, were negotiated at arm's length and in good faith and are, in the aggregate, the best terms available to the Debtors and generally consistent with the terms of DIP financings in comparable circumstances.

## Need for Interim Relief

31. Based on discussions with the Debtors and their other advisors, I believe that the Debtors' access to the DIP Financing is necessary to continue the operation of the Debtors' business, supplements the Debtors' liquidity needs, helps the Debtors preserve the value of their estates, and increases the prospect of executing a successful going-concern sale. Based on the foregoing and my experience, I believe that, absent the Bankruptcy Court's entry of the interim DIP Order, the Debtors' business will be immediately and irreparably harmed.

32. Based on my experience in negotiating DIP financings and my involvement in these DIP Facilities as well as my discussions with the Debtors and their other advisors, I believe that the DIP Facilities are reasonable and necessary under the circumstances and that without such facilities the Debtors would not have sufficient liquidity and would risk liquidation.

[*Remainder of Page Intentionally Left Blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: November 8, 2023
      New York, New York

                                           /s/ *Ajay Bijoor*
                                           Ajay Bijoor
                                           Managing Director
                                           Baird Global Investment Banking