**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ANAGRAM HOLDINGS, LLC, *et al.*,[1] | ) Case No. 23-90901 (MI) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

**DECLARATION OF ADRIAN FRANKUM
<u>IN SUPPORT OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS</u>**

Pursuant to 28 U.S.C. § 1746, I, Adrian Frankum, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.      I am the Chief Restructuring Officer (the "<u>CRO</u>") of Anagram Holdings, LLC ("<u>Anagram Holdings</u>"), Anagram International, Inc. ("<u>Anagram International</u>") and Anagram International Holdings, Inc. ("<u>Anagram International Holdings</u>" and, together with Anagram Holdings and Anagram International, the "<u>Debtors</u>," "<u>Anagram</u>," or the "<u>Company</u>").  I have more than 24 years of experience in the restructuring industry and have served as the CRO of the Company since April 2023.  I am also a Senior Managing Director at Ankura Consulting Group, LLC.  I hold an MBA from NYU Stern School of Business and a BBA from the University of Georgia.  I am also a certified public accountant (inactive).

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Anagram Holdings, LLC (8535); Anagram International, Inc. (2523) and Anagram International Holdings, Inc. (5837).  The location of the Debtors' service address for purposes of these chapter 11 cases is: 7700 Anagram Drive, Eden Prairie, MN 55344. For the avoidance of doubt, the Debtors' chapter 11 cases are not proposed to be consolidated with Party City Holdco Inc. ("<u>Party City Holdco</u>") and its affiliate debtors (collectively, "<u>Party City</u>") which emerged from chapter 11 cases in this Court on October 12, 2023. See *In re Party City Holdco Inc., et. al.*, Case No. 23-90005 (MI) (Bankr. S.D. Tex).  Any reference herein to the Debtors does not include the debtor-entities that were administered in the Party City Chapter 11 Cases.

2.      As CRO, I am responsible for the Company's financial and operational management, and for providing strategic advice to the Restructuring Committee (as defined herein), in connection with the Debtors' restructuring, including these chapter 11 cases and the Sale Process (as defined herein).  Based on my tenure with the Debtors, my review of public and nonpublic documents relating to the Debtors, and my discussions with other members of the Debtors' management team and the Debtors' advisors, I am generally familiar with the Debtors' business, financial condition, policies and procedures, day-to-day operations, and books and records.

3.      Except as otherwise noted, I have personal knowledge of the matters set forth herein or have gained knowledge of such matters from the Company's employees who report to me in the ordinary course of my responsibilities or the Debtors' advisors.  I am authorized by each of the Debtors to submit this declaration (this "Declaration") on their behalf.  References to the Bankruptcy Code (as defined herein), the chapter 11 process, and related legal matters are based on my understanding of these matters in reliance on the explanation provided by, and the advice of, counsel.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

4.      On November 8, 2023 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), with the United States Bankruptcy Court for the Southern District of Texas (the "Court").  The Debtors intend to use these chapter 11 proceedings to consummate a sale of all or substantially all of their assets and have secured a stalking horse credit bid (subject to higher or better offers) that provides for the credit bid of the full amount of both the DIP Notes Facility and

the First Lien Notes, as well as the assumption of all trade claims and the transfer of all employees on terms no less favorable than their current employment terms.

5.        To minimize the adverse effects on their business during these chapter 11 cases, the Debtors have filed motions and pleadings seeking various types of "first day" relief (collectively, the "First Day Motions").  I submit this Declaration to assist the Court and parties in interest in understanding the circumstances compelling the commencement of these chapter 11 cases and in support of the Debtors' chapter 11 petitions and First Day Motions filed contemporaneously herewith.

6.        To familiarize the Court with the Debtors, their business, the circumstances leading up to these chapter 11 cases, and the relief the Debtors are seeking in the First Day Motions, I have organized this Declaration into five sections:

- **Part I** provides an overview of the Debtors and these chapter 11 cases;

- **Part II** provides background information on Anagram's business and operations;

- **Part III** offers an overview of the Debtors' prepetition corporate and capital structure;

- **Part IV** describes the circumstances leading to the filing of these chapter 11 cases and an overview of the Sale Process (as defined herein); and

- **Part V** summarizes the relief requested in the First Day Motions.

## I.    Overview[2]

7.        Anagram is a leading manufacturer of foil balloons and inflated décor, distributing and selling its products both domestically and internationally.  Anagram's customers include party supply specialty stores, grocers, mass marketers, parks, drugstores and discount variety stores.

---

[2]    Capitalized terms not defined in this Overview section shall have the meaning ascribed to such terms in the remainder of this Declaration.

Anagram services its customers both directly, through retailers such as Walmart, Canadian Tire, and Dollar Tree and through key domestic and international distributors.  Anagram gained its competitive advantage in the market through its vertically integrated business model, which is supported by approximately 350 employees operating manufacturing, production and distribution facilities encompassing over 500,000 square feet.

8.      The Debtors are wholly-owned subsidiaries of Party City Holdings Inc. ("PCHI"), which, together with certain of its affiliates, recently emerged from their own chapter 11 cases before this Court (the "Party City Chapter 11 Cases").  The Anagram Debtors were not "debtors" in the Party City Chapter 11 Cases and were not borrowers or guarantors of any funded debt issued by Party City.

9.      Prior to the commencement of the Party City Chapter 11 Cases, Party City's directors and officers also served as directors and officers of Anagram.  However, in connection with the filing of the Party City Chapter 11 Cases, Mr. William L. Transier was appointed as an independent director of Anagram and as the sole member of a newly-formed restructuring committee (the "Restructuring Committee").  The Restructuring Committee has sole authority with respect to, among other things, any proposed significant restructuring transactions and the administration of these chapter 11 cases.  In March 2023, the Restructuring Committee retained separate advisors for Anagram, namely Simpson Thacher & Bartlett LLP, as legal counsel, and Ankura Consulting Group, as financial advisor.  In July 2023, Anagram retained Robert W. Baird & Co. ("Baird") as the Company's investment banker.

10.     In 2020, Party City executed a series of transactions whereby, among other transactions not related to Anagram, certain of Party City's noteholders exchanged their Party City notes for the Second Lien Notes and concurrently purchased the First Lien Notes (the "2020

Exchange Transaction"). As a result of the 2020 Exchange Transaction, the Company's current capital structure consists of First Lien Notes in the face amount of $110 million and Second Lien Notes in the face amount of approximately $84.7 million. The Company also has a prepetition ABL Facility with Wells Fargo for $15 million, subject to a borrowing base.

11.     Although the Debtors operate largely independently of Party City, with their own customers, employees, vendors, and debt facilities, the Debtors' business remains connected to Party City. The parties' relationship is governed by three (3) critical intercompany contracts (collectively, the "Anagram-Party City Contracts"), including the (i) Services Agreement; (ii) IP Cross-License Agreement; and (iii) the Supply Agreement, each of which were entered into on July 30, 2020 in connection with the 2020 Exchange Transaction. In May 2023, Party City moved to reject the Anagram-Party City Contracts in its chapter 11 cases, which has put additional pressure on the Debtors' operations and on the restructuring negotiations. The proposed rejection remains pending in the Party City Chapter 11 Cases.

12.     Since 2020, the Debtors have continued to encounter financial challenges resulting from, among other things, unsustainable levels of debt on their balance sheet, the COVID-19 pandemic and its lingering effects, and cash distributions from the Company to Party City. Moreover, global inflation and helium shortages have exacerbated these challenges and have further strained the Debtors' liquidity. The Company's adjusted EBITDA declined from approximately $52 million in 2021 to approximately $29 million in 2022.

13.     Faced with these operational and business challenges, the Debtors explored restructuring alternatives. The Debtors' restructuring efforts have been overseen by the Restructuring Committee. The Debtors and their advisors engaged in extensive discussions with an *ad hoc* group holding approximately 60% of the Debtors' First Lien Notes and more than 50%

of the Debtors' Second Lien Notes (the "Ad Hoc Group") as well as other creditors that are not part of the Ad Hoc Group, on restructuring alternatives, including deleveraging, financing and other non-sale transactions. Ultimately, the Debtors and their constituents were unable to reach consensus on a reorganization transaction.

14. As a result, the Debtors pivoted to pursue a sale transaction to maximize value for the benefit of all of the Debtors' constituents. To that end, in early October, the Debtors and Baird, at the direction and under the guidance of the Restructuring Committee, commenced a robust marketing process (the "Sale Process") for all or substantially all of the Debtors' assets, which the Debtors intend to complete over the course of these chapter 11 cases. The Ad Hoc Group submitted a credit bid for the Debtors' assets through a newly formed entity that, following negotiations with the Debtors, was accepted as a stalking horse bid (the "Stalking Horse Bid", and such bidder, the "Stalking Horse Bidder"). The Stalking Horse Bid is now supported by holders of almost 100% of the First Lien Notes.

15. Pursuant to the Stalking Horse Asset Purchase Agreement (the "Stalking Horse APA"), the Stalking Horse Bidder has agreed to, among other terms:

- credit bid the full amount of the DIP Notes Facility and First Lien Notes totaling approximately $168.4 million;

- offer employment to all of the Debtors' employees on terms no less favorable than their current terms;

- assume all of the Debtors' pre and post-petition trade payables and operating expenses;

- pay off or assume the DIP ABL Facility;

- provide a minimum of $1.5 million of cash to wind down the Debtors' estates; and

- pay cure costs relating to all assumed contracts.

16.     The Debtors will continue to seek higher or better offers for their assets from potential buyers.  To that end, contemporaneously herewith, the Debtors have filed a motion seeking approval of bidding and auction procedures to govern the Sale Process (the "Bidding Procedures").  Pursuant to the Bidding Procedures, all interested parties will have the opportunity to continue to bid for the Debtors' business and assets on the timeline set forth therein.

17.     The Debtors have also been working diligently to establish themselves, as soon as possible, as a standalone business that does not rely on Party City for administrative support services.  Specifically, the Debtors have been working to procure their own information technology ("IT") systems, as well as to administer their own human resource functions (e.g., payroll and benefits), licensing programs, logistics, legal matters and insurance programs among other work streams.  The Debtors have also been assessing their vendor and customer contract portfolio to determine whether new standalone contracts will be needed once the Debtors are separated from Party City.  While the transition process is underway, it is not yet complete.  Until then, the Debtors need to avail themselves of the protections provided by the Bankruptcy Code.

18.     To obtain the liquidity needed to fund these chapter 11 cases and the Sale Process, following an extensive marketing process, the Debtors have secured (i) commitments from holders of almost 100% of the First Lien Notes – and over 50% of the Second Lien Notes – for a $22 million debtor-in-possession notes facility (the "DIP Notes Facility") conditioned on, among other terms, satisfying certain milestones in respect of the Sale Process timeline (the "DIP Milestones") and (ii) a commitment from the ABL Lender to allow the Debtors to have continued access to the Debtors' existing $15 million ABL Facility after the Petition Date, subject to certain modifications that are set forth in the DIP Orders (as so modified, the "DIP ABL Facility" and, together with the

DIP Notes Facility, the "DIP Facilities").  Key terms of the DIP Facilities are described more fully in the DIP Motion filed contemporaneously herewith.

19.    The Bidding Procedures contemplate the following proposed timeline in compliance with the DIP milestones and the Stalking Horse APA ("APA Milestones"):

| Event | Proposed Date | APA Milestone | DIP Milestone |
|---|---|---|---|
| **Bid Procedures Hearing** | Friday, Nov. 17 | N/A | Nov. 29, 2023 |
| **IOI Deadline** | Friday, Nov. 20 | N/A | N/A |
| **Final Bid Deadline** | Thursday, Nov. 30 | N/A | N/A |
| **Auction** | Tuesday, Dec. 5 | Dec. 15, 2023 | N/A |
| **Final DIP Approval** | Wednesday, Dec. 6 | N/A | Dec. 13, 2023 |
| **Sale Objection Deadline** | Monday, Dec. 11 | N/A | N/A |
| **Sale Hearing** | Monday, Dec. 18 | Dec. 22, 2023 | Jan. 15, 2024 |
| **Sale Closing** | Friday, Dec. 29 | Dec. 29, 2023 | Jan. 28, 2024 |

20.    The Sale Process began approximately five (5) weeks prior to the Petition Date. Accordingly, the timeline proposed by the Debtors minimizes the adverse impact on the Debtors' operations, vendors, and employees, while still providing adequate opportunity to secure executable bids for the Debtors' assets for the highest or best value.  The amount of work accomplished prepetition by the Debtors and their advisors in connection with the Sale Process enhances the Debtors' ability to complete the Sale Process on the timeframe proposed and does not prejudice parties in interest.  The Debtors are confident that parties who are the most likely participants in the sale process are either already involved in, or aware of, the Sale Process or will have adequate time to participate.  The Debtors believe that proceeding with the Sale Process is preferable to any other alternative and will maximize the value of their estates and inure to the benefit of all constituents, including their employees.

II.    **Anagram's History and Operations**

    A.    **Corporate History**

21.    Anagram was founded in 1978 by Garry Kieves, in Eden Prairie, Minnesota.  In 1980, Anagram became the first company to manufacture "message" balloons.  In subsequent years, Anagram added new products to its offerings, including (i) "airwalkers," attention-drawing, large, full-body shape balloons, (ii) "insiders," one balloon inside another, and (iii) "panoramic" balloons, or foil balloons with full-color images or scenes printed on them.  In 1998, Anagram was acquired by Amscan Inc. ("Amscan"), an importer and distributor of party goods, and Amscan eventually became a subsidiary of PCHI.

22.    In 2015, Party City Holdco, the ultimate parent company of PCHI, Amscan and Anagram, conducted an initial public offering, listing its shares on the New York Stock Exchange under the symbol "PRTY." Pursuant to the plan of reorganization confirmed in the Party City Chapter 11 Cases ("Party City's Chapter 11 Plan")[3], the existing common stock was cancelled and Party City issued its new equity interests to its creditors, a substantial majority of which is now held by Party City's prepetition noteholders.

    B.    **Anagram's Business and Operations**

23.    For the year ended December 31, 2022, over 85% of Anagram's products were designed as helium-filled foil balloons with the balance comprised of air-filled foil balloon accessories.  The Debtors market their products to various types of customers in over 40 countries. Broad distribution channels have provided Anagram with access to diversified revenue streams and end-use customers.  With a product portfolio that ranges from products sold for as low as $1

---

[3]    See *In re Party City Holdco Inc.,* Case No. 23-90005 (Docket No. 1711).

at certain discount variety stores to deluxe foil balloon products retailing for approximately $30, the Debtors are able to deliver products across the consumer value chain.

24.     The Debtors primarily conduct their operations at two (2) facilities: (i) a 110,000 sq. ft. corporate headquarters office, manufacturing and printing facility (the "Manufacturing Facility") in Eden Prairie, Minnesota and (ii) a 391,000 sq. ft. distribution facility in Bloomington, Minnesota (the "Distribution Facility" and, together with the Manufacturing Facility, the "Facilities"). The Debtors employ approximately 350 employees at the Facilities.

### 1.     Vertical Integration

25.     Anagram's business is vertically integrated in terms of product design, engineering, manufacturing and merchandising, allowing the Company to capture efficiencies across the supply chain and support the Company's capacity to focus on key priorities, including: (i) design and innovation; (ii) exclusive licensing arrangements; and (iii) a diversified customer-base which includes key partnerships with domestic and international distributors.

#### A.     Design and Innovation

26.     The Debtors have achieved their leading market position organically through continued product innovation and production refinement, as well as research and development to adapt to changes in customer preferences. Aside from certain overseas supply agreements, the vast majority of Anagram's products are manufactured at the Manufacturing Facility in Eden Prairie, Minnesota. The centralized manufacturing approach, combined with the skills of experienced long-term employees, foster early collaboration between disciplines that has contributed to significant efficiencies and synergies regarding new product design and development, factory automation, reduced manufacturing waste and sustainable manufacturing processes.

27.     The advancements in Anagram's product development coupled with automation in its manufacturing process and a shorter domestic supply chain have contributed to Anagram maintaining a leading position in the marketplace.

B.      License Agreements

28.     Anagram is a licensee of popular characters of well-known brands, including Disney.  Through the IP Cross-License Agreement with Party City, Anagram has access to additional licensing arrangements with popular brands and characters, including the National Football League, National Hockey League, Nintendo, Marvel, Barbie, Hot Wheels Monster Trucks and Thomas & Friends.

29.     To capitalize on its exclusive access to these household names, Anagram's creative team develops products to enhance the unique attributes associated with the particular license. Anagram's engineering and manufacturing teams collaborate to optimally and efficiently design and produce the product and Anagram's merchandizing team develops displays to enhance marketing at the retail point of sale.

**2.      Product Manufacturing**

30.     For the year ended December 31, 2022, Anagram manufactured more than 80% of its products (including products sold to Party City) at the Manufacturing Facility.   The Manufacturing Facility is highly automated and its products are produced at globally competitive costs.  State-of-the-art printing, forming, folding and packaging equipment support most of the Debtors' manufacturing operations.  Average size and sales volume allow Anagram to operate its manufacturing equipment on a 24-7 basis, thus lowering production costs per unit.  Anagram also uses available capacity to manufacture products for third parties, which allows Anagram to maintain an appropriate level of equipment utilization.

31.     The Debtors are also known for extremely robust product safety policies and procedures, their partnerships with third party labs and state of the art in-house safety testing program.  The Debtors' in-house engineering team is dedicated to quality and safety that provides confidence to its distributors and downstream retail customers.

### 3.     Product Distribution and Market Channels

32.     The Debtors' distribution network is a key competitive strength in its vertically integrated model.  Over the past several decades, the Debtors have built a robust distribution network that includes the following five (5) key channels:

| Channel | Description |
|---|---|
| **Party City** | Sales to Party City in accordance with the Supply Agreement |
| **Distributors** | Sales to North American distribution companies with end markets of grocers, party stores and decorators |
| **Value** | Sales to discount value goods and "dollar store" customers |
| **Mass** | Sales to large box stores and similar retailers |
| **International** | Sales to (i) Europe, (ii) Mexico (through Convergram), (iii) Asia, (iv) the Middle East and (v) South Africa through a wide network of international distributors |

33.     The Distribution Facility serves as the Debtors' main distribution point for direct retail customers and domestic and international distributors.  The state-of-the-art facility utilizes an inventory management system that facilitates turnaround times as short as 48 hours (for in-stock products) and maintains strong fill rates.  From the Distribution Facility, the Debtors ship products directly to retailers and distributors throughout the world.  The Debtors also utilize a bypass system for some of its Party City orders, which allows them to ship products directly from selected third-party suppliers to its Company-owned warehouses, thus bypassing the Distribution

Facility.  In addition to lowering Anagram's distribution costs, this bypass system enhances Anagram's warehouse capacity.

34.     The Debtors maintain longstanding business relationships with a number of its top distributor customers who have come to rely on the Debtors' foil balloon products.  Further, throughout its history, the Debtors have built important infrastructure to support its distribution network, with in-house customer service and merchandising experts to support field operations and promote the brand's success.

35.     Anagram has benefited from key strategic alliances in targeted regions around the globe in achieving its market penetration, including its joint venture in Convergram[4] with a leading Mexican foil balloon manufacturer, Convertidora, to distribute foil balloons principally in Mexico and Latin America.  In June 2018, Anagram entered into a supply agreement with Chaoan Hengsheng Industrial Co., Ltd. ("Hengsheng"), a Chinese manufacturer, pursuant to which Hengsheng supplies balloons (mainly shaped as large numbers, "0" through "9") to Anagram.

### 4.     Intellectual Property

36.     The Debtors have developed proprietary technologies that they believe provides an advantage in the balloon industry in which the Debtors operate.  The Debtors seek to protect their intellectual property rights, including their intellectual property rights in these proprietary technologies, through patent, trademark, copyright and trade secret laws, as well as confidentiality agreements and other contractual provisions to restrict access to and disclosure of their intellectual property.  In the aggregate, Anagram's intellectual property rights have significant value and are important to the strength of its brand and the favorable perception of its products.

---

[4]     *See*, Management and Ownership Agreement, dated November 30, 2022, by and among Convertidora Industrial, S.A.B de C.V. ("**Convertidora**"), Convergram de Mexico S. de R. L. ("Convergram"), Amscan Holdings, Inc. and Anagram International.

37.     As of the Petition Date, Anagram collectively owns approximately 27 domestic and international patents, 130 foreign and international trademarks, and 206 copyrights.

### C.     The Anagram-Party City Agreements

38.     Despite the Company's unique competitive advantages related to the actual development, marketing and manufacturing of its products, the Anagram-Party City Agreements still remain critical in supporting the Company during this transition process, particularly as it relates to ensuring uninterrupted business operations and sustaining the revenue streams necessary to support the business on a day-to-day basis.

39.     Pursuant to the Services Agreement (as amended, restated or otherwise modified from time to time, the "Services Agreement"), PCHI provides an array of services to Anagram, including (i) general administration, (ii) tax, internal audit, and legal support, (iii) accounting consultation and compliance support, (iv) human resources information systems and payroll systems services, including system changes and process enhancement, (vi) general insurance, health insurance, and workers' compensation, each including premiums and claims, (vii) real property rent (including the rent attributable to the master lease agreement underlying the Manufacturing Facility), (viii) IT services, including any underlying IT licenses to run software/programs, and (ix) sales people services directly dedicated to the sale of balloons. Additionally, pursuant to the Services Agreement, the Debtors provide certain reverse services to PCHI, including electronic data interchange programmers.

40.     Pursuant to the IP Cross-License Agreement (as amended, restated or otherwise modified from time to time, the "IP Cross-License Agreement"), PCHI, on behalf of itself and the other Party City affiliates, grants to Anagram a non-exclusive license to all intellectual property (whether now or hereafter acquired) owned by Party City and used by Anagram in its business. In return, Anagram International, on behalf of itself and the Company, grants to Party City a non-

exclusive license to all intellectual property (whether now or hereafter acquired) owned by the Company and used by Party City in its business.

41.     Additionally, under the IP Cross-License Agreement, PCHI agreed to keep existing arrangements in place with respect to any intellectual property that (i) PCHI licenses from a third party and (ii) permits Anagram to use as of the date of the IP Cross-License Agreement.  For any third-party intellectual property licensed by Party City after the date of the IP Cross-License Agreement, PCHI and Anagram International agree to use reasonable best efforts to negotiate an arrangement pursuant to which Anagram is permitted to use such third-party intellectual property licensed to Party City.  The IP Cross-License Agreement contains similar provisions in favor of Party City with respect to Anagram's third-party intellectual property.  Both PCHI and Anagram International agree not to (except in the ordinary course of business) terminate or amend any third party license agreement of the type described above in a manner that would adversely affect the other party's ability to use the applicable third party license agreement without reasonable prior notice and consultation with the other party.

42.     Pursuant to the Supply Agreement (as amended, restated or otherwise modified from time to time, the "Supply Agreement"), Amscan designates Anagram International as its primary supplier of balloons and agrees to purchase from Anagram International, and Anagram International agrees to supply to Amscan, on an annual basis (i) a minimum of 95% of PCHI's aggregate U.S. dollar or U.S. dollar-equivalent purchases of foil balloons for the domestic market and (ii) a minimum of 70% of Amscan's and certain of its affiliates' aggregate U.S. dollar-equivalent purchases of foil balloons for the international markets.  PCHI guarantees Amscan's obligations under the Supply Agreement.  If Amscan does not fulfill the total annual purchase commitments described above in any given year, it agrees to pay any shortfall to Anagram

International in cash, through additional balloon orders or a mix of both.  The total annual purchase commitments are subject to reasonable pro rata downward adjustment in the event of a material adverse change to Anagram International's portfolio of licenses (or other rights) to sell balloons bearing or using third-party intellectual property.

43.     If the Anagram-Party City Contracts are terminated or breached by Party City, Party City is obligated to pay to Anagram International $40 million in termination fees.  Under Party City's Chapter 11 Plan, if the Anagram-Party City contracts are rejected, such termination fees will be treated as pre-petition general unsecured claims that will receive a *de minimis* recovery.

44.     Party City accounts for approximately 38% of the Debtors' sales.  Moreover, the products that the Debtors market through their rights under the IP Cross-License Agreement comprise a significant portion of the Company's revenues.  For context, for the year ended December 31, 2022: (i) balloon sales associated with licenses owned by Anagram accounted for approximately $12.3 million, or 6%, of total gross sales, and (ii) sales of licensed products, in which the licenses are owned by Party City, comprised approximately $25 million, or 12% of total gross sales.

## III.     Anagram Prepetition Corporate and Capital Structure

### A.     Anagram's Corporate Structure

45.     Anagram Holdings, a Delaware limited liability company, is a wholly-owned subsidiary of PCHI.  Anagram International, a Minnesota corporation, is a wholly-owned subsidiary of Anagram Holdings and the entity through which the Debtors conduct their operations.  Anagram International Holdings, a Minnesota corporation, is a wholly-owned subsidiary of Anagram International.[5] Through a joint venture agreement with Convertidora,

---

[5]     Anagram International Holdings is dormant and does not conduct any operations.

Anagram International also owns 49.9% of the outstanding equity interests of Convergram.  The following chart depicts the Debtors' corporate organizational structure:



**B.      Anagram Governance and Management**

46.      After the 2020 Exchange Transaction, Party City continued to control Anagram as a wholly-owned subsidiary.  Prior to December 6, 2022, the directors and senior management of Anagram were also directors and/or senior management, as applicable, of Party City. On December 6, 2022, in light of the impending Party City Chapter 11 Cases, Mr. Transier was appointed as the independent director for each of Anagram Holdings, Anagram International and Anagram International Holdings (the "Independent Director") and was designated to serve on the Restructuring Committee upon its formation.  The Restructuring Committee was granted authority with respect to, among other things, any proposed significant restructuring transactions and the administration of these chapter 11 cases.  Currently, the Independent Director is the sole manager

of Anagram Holdings.   The boards of directors of Anagram International and Anagram International Holdings each consist of two members: (i) the Independent Director and (ii) Mr. Steven Collins.

47.     On March 23, 2023, certain officers of Anagram that were also officers of Party City resigned from their roles at the Debtors.   On April 26, 2023, I was appointed by the Independent Director as the CRO of each of the Debtors and serve alongside Christopher Wiles, the Debtors' VP of Finance, who is responsible for overseeing the financial activities of the Debtors.

### C.     Debtors' Capital Structure[6]

48.     As of the date hereof, the Debtors have approximately $240.4 million in total funded debt obligations.   The outstanding amounts and priorities of each debt obligation are as follows:

| Funded Debt | Maturity | Approximate Principal Amount Outstanding (in millions) |
|---|---|---|
| ABL Facility | May 2024 | $6.2 |
| First Lien Notes | August 2025 | $125.3 |
| Second Lien Notes | August 2026 | $108.9 |
| Total Funded Debt Obligations | | $240.4 |

### 1.     Secured Indebtedness

### A.     ABL Facility

49.     On May 7, 2021, Anagram Holdings and Anagram International, as borrowers, entered into a Credit Agreement (as amended, restated, supplemented, or otherwise modified as of

---

[6]   The following description of the Debtors' capital structure is for informational purposes only and is qualified in its entirety by reference to the documents setting forth the specific terms of the Debtors' obligations and any related agreements.

the Petition Date, the "ABL Credit Agreement") with certain lenders (the "ABL Lenders") and Wells Fargo Bank, National Association, as agent (the "ABL Agent"), establishing a $15 million asset-based revolving credit facility (the "ABL Facility"). The ABL Facility is guaranteed by Anagram International Holdings. The ABL Facility provides for revolving loans, subject to a borrowing base comprised of eligible receivables and inventory. As of the Petition Date, approximately $6.2 million is outstanding under the ABL Facility. The ABL Facility has a stated maturity of May 7, 2024.

50.     Pursuant to that certain Guaranty and Security Agreement, dated as of May 7, 2021, among the Debtors and the ABL Agent (as amended, the "ABL Security Agreement"), and in accordance with the ABL/Notes Intercreditor Agreements (as defined below), the ABL Facility is secured by a lien on substantially all of the Debtors' assets and property (the "Prepetition Collateral"), including: (i) a first priority lien on including, (with certain exceptions) inventory and accounts receivable (the "ABL Priority Collateral") and (ii) a junior lien on the Debtors' real property, intellectual property, equipment, and fixtures (the "Notes Priority Collateral"). Anagram's equity interest in Convergram and Convergram's assets are excluded from the Prepetition Collateral.

        B.     First Lien Notes

51.     On July 30, 2020, Anagram International and Anagram Holdings (collectively, the "Anagram Issuers") issued $110 million in aggregate principal amount of 15.00% PIK/Cash Senior Secured First Lien Notes due 2025 (the "First Lien Notes"). The First Lien Notes were issued pursuant to the Indenture, dated as of July 30, 2020 (as amended, restated or otherwise modified from time to time, the "First Lien Notes Indenture"), among the Anagram Issuers, as co-issuers, Anagram International Holdings, as a guarantor, and Ankura Trust Company, as predecessor trustee and collateral trustee (together with its successor Computershare Trust Company, National

Association, the "First Lien Notes Trustee").  The First Lien Notes accrue interest at (i) a rate of 10.00% per annum, payable in cash and (ii) a rate of 5.00% payable in kind by capitalizing such interest payment and increasing the aggregate principal amount of the First Lien Notes by the amount thereof ("PIK Interest").  As of the Petition Date, approximately $125.3 million in aggregate principal amount of First Lien Notes remains outstanding.  The First Lien Notes have a stated maturity of August 15, 2025.

52.    Pursuant to that certain First Lien Pledge and Security Agreement, dated as of July 30, 2020, among Debtors and the First Lien Notes Trustee (as amended, the "First Lien Notes Security Agreement"), and in accordance with the Intercreditor Agreements (as defined below), the First Lien Notes are secured by a lien on the Prepetition Collateral, including (i) a first priority lien on the Notes Priority Collateral and (ii) a junior lien on the ABL Priority Collateral.

C.    Second Lien Notes

53.    On July 30, 2020, the Anagram Issuers issued approximately $84.7 million in aggregate principal amount of 10.00% PIK/Cash Senior Secured Second Lien Notes due 2026 (the "Second Lien Notes" and, together with the First Lien Notes, the "Notes").  The Second Lien Notes were issued pursuant to the Indenture, dated as of July 30, 2020 (as amended, restated or otherwise modified from time to time, the "Second Lien Notes Indenture" and, together with the First Lien Notes Indenture, the "Indentures"), among the Anagram Issuers, as co-issuers, Anagram International Holdings, Inc., as guarantor, and Ankura Trust Company, as trustee and collateral trustee (together with its successors, the "Second Lien Notes Trustee").  Interest on the Second Lien Notes accrues at (i) a rate of 5.00% per annum, payable, at the Anagram Issuers' option, entirely in cash or entirely as PIK Interest; and (ii) a rate of 5.00% per annum of PIK Interest, in each case, payable semi-annually in arrears on February 15 and August 15 of each year, provided that on August 15, 2025, interest is required to be PIK Interest.  As of the Petition Date,

approximately $108.9 million in aggregate principal amount of Second Lien Notes was outstanding.  The Second Lien Notes mature on August 15, 2026.

54.     Pursuant to that certain Second Lien Pledge and Security Agreement, dated as of July 30, 2020, among the Debtors and the Second Lien Notes Trustee (as amended, the "Second Lien Security Agreement"), and in accordance with the Intercreditor Agreements (as defined below), the Second Lien Notes are secured by a lien on the Prepetition Collateral, including (i) a second priority lien on the Notes Priority Collateral and (ii) a lien on the ABL Priority Collateral, which lien is junior to the lien of the ABL Lenders and the holders of the First Lien Notes (the "First Lien Noteholders") on such collateral.

D.     Intercreditor Agreements

55.     The relative rights and priorities of the ABL Lenders, the First Lien Noteholders and the holders of the Second Lien Notes (the "Second Lien Noteholders" and, together with the First Lien Noteholders, the "Noteholders") are governed by the Intercreditor Agreement (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "ABL/Notes Intercreditor Agreement"), dated as of May 7, 2021, among the Debtors, the ABL Agent, the First Lien Notes Agent and the Second Lien Notes Agent.  Pursuant to the ABL/Notes Intercreditor Agreement, (i) the ABL Lenders' lien on the ABL Facility Priority Lien Collateral ranks senior to the lien of the Noteholders on such collateral and (ii) the Noteholders' lien on the Notes Priority Collateral ranks senior to the lien of the ABL Lenders on such collateral. Additionally, pursuant to the ABL/Notes Intercreditor Agreement, the Noteholders are deemed to have consented to any debtor in possession financing consented to by the ABL Lenders which is secured by ABL Priority Collateral.

56.     The relative rights and priorities of the First Lien Noteholders and the Second Lien Noteholders are governed by the First Lien/Second Lien Intercreditor Agreement (as amended,

restated, amended and restated, supplemented, or otherwise modified from time to time, the "1L/2L Notes Intercreditor Agreement" and, together with the ABL/Notes Intercreditor Agreement, the "Intercreditor Agreements"), dated as of July 30, 2020, among the First Lien Notes Trustee and the Second Lien Notes Trustee.  The 1L/2L Notes Intercreditor Agreement provides that, with respect to the Prepetition Collateral, the First Lien Noteholders' lien ranks senior to that of the Second Lien Noteholders.  The 1L/2L Notes Intercreditor Agreement further provides that Second Lien Noteholders are deemed to have consented to any debtor-in-possession financing consented to by the First Lien Noteholders which is secured by the Prepetition Collateral.  The 1L/2L Notes Intercreditor Agreement provides that the First Lien Noteholders and Second Lien Noteholders may credit bid in connection with the sale of the Prepetition Collateral, subject to the terms and limitations set forth in the 1L/2L Intercreditor Agreement.

57.     The relative priorities of liens with respect to the Prepetition Collateral as of the Petition Date is summarized in the following table:

| ABL Priority Collateral | Notes Priority Collateral |
| --- | --- |
| 1.   ABL Lenders | 1.   First Lien Noteholders |
| 2.   First Lien Noteholders | 2.   Second Lien Noteholders |
| 3.   Second Lien Noteholders | 3.   ABL Lenders |

### 2.     Unsecured Debt

58.     In the ordinary course of business, the Debtors incur trade credit on varying terms. As of the Petition Date, the Debtors estimate there is approximately $8.6 million in general unsecured claims outstanding.

### 3.     Equity Ownership

59.     All of the existing equity interests in Anagram Holdings are owned by PCHI.

**IV.     Events Leading to These Chapter 11 Cases**

60.     Several factors have contributed to the Debtors' decision to commence these chapter 11 cases and market their assets, including the lingering effects of the COVID-19 pandemic coupled with helium shortages and inflation, liquidity challenges.  In the months leading up to the chapter 11 cases, the Debtors explored various different strategic initiatives, but ultimately concluded that the sale of the Debtors' assets in chapter 11 was the optimal path to maximize value of the Debtors' estates.

**A.     Challenges to Debtors' Business & Liquidity Constraints**

61.     The Debtors' business was significantly impacted by the COVID-19 pandemic, as demand for gathering-oriented party products, like the balloons that the Company manufactures, plummeted.  The impacts of the COVID-19 pandemic led to reduced order flow and employee furloughs during the period April to August 2020, thus forcing the Company to seek incremental liquidity to operate its business, fund its debt, and service its commercial and other obligations.

62.     Additionally, a global shortage of helium gas due primarily to decreased market supply from major producers has resulted in increased helium prices, which has negatively impacted the Company's bottom line.  The Company's sales of foil balloons to consumer products purchasers at wholesale typically decline as the supply of helium decreases and the price increases.

63.     Similarly, overall global inflation has negatively affected the Company's operating margins.  The elevated costs of raw materials, inventory, direct labor wages and other services have increased pressure on the Company without a corresponding ability to meaningfully raise prices to levels that effectively offset inflation (i.e., lower margins).  Given both market standards and contractual provisions with certain of its wholesale customers, the Company typically only increases prices of its consumer products offerings once per year (except for 2021 when prices were increased twice over the year).

64.     These operational challenges, in turn, placed a significant strain on the Debtors'

liquidity.  While the 2020 Exchange Transaction provided the Debtors with some incremental

liquidity to support its operations and weather the COVID-19 pandemic, the relief was limited.  In

May 2021, the Company entered into the ABL Facility to obtain additional liquidity for its

operations, but the additional liquidity infusion still proved insufficient to fully offset the excess

debt and other significant headwinds the Company has faced.

65.     Certain intercompany transactions between the Debtors and Party City have also

placed additional pressure on the Debtors' liquidity.  In August 2022, Party City borrowed $22

million from the Debtors through an intercompany loan pursuant to a promissory note (as

amended, restated, supplemented, or otherwise modified as of the Petition Date, the

"**Intercompany Promissory Note**") which has not been satisfied and will be treated as a general

unsecured claim under Party City's Chapter 11 Plan.  Subsequently, in March 2023, the Debtors

also discovered that Party City has overcharged them for reimbursements related to Party City's

group tax payments aggregating approximately $7 million.

**B.     Unsustainable Capital Structure**

66.     In July 2020, during the COVID-19 pandemic, Party City implemented the 2020

Exchange Transaction, which increased the Debtors' leverage.[7]  Specifically, Party City

commenced an offer to exchange ("**Exchange Offer**") any and all of Party City's then existing

unsecured notes ("**Existing PC Debt**") for, among other things, the Second Lien Notes to be issued

---

[7]     More information concerning the 2020 Exchange Transaction can be found in Party City's filings with the
Securities and Exchange Commission in connection with the 2020 Exchange Transaction. *See, e.g.*, Party City
Holdco      Inc.,      Form      8-K,      June      29,      2020,      available      at
https://www.sec.gov/ix?doc=/Archives/edgar/data/0001592058/000119312520191451/d104395d8k.htm;  Party
City      Holdco      Inc.,      Form      8-K,      July      27,      2020,      available      at
https://www.sec.gov/ix?doc=/Archives/edgar/data/0001592058/000119312520199059/d53343d8k.htm.

by Anagram, and commenced a rights offering ("Rights Offering") permitting holders of Existing PC Debt to subscribe to First Lien Notes to be issued by Anagram.  As a result of the Exchange Offer and Rights Offering, Anagram issued $110 million aggregate principal amount of First Lien Notes and $84.7 million aggregate principal amount of Second Lien Notes, increasing the Company's overall indebtedness by approximately $194.7 million.

67.     Given the financial and operational challenges that the Debtors have faced since the 2020 Exchange Transaction, the Debtors' existing capital structure is unsustainable.  The Debtors have attempted to negotiate a deleveraging transaction that would not involve the sale of the Debtors' business, but have been unsuccessful.

### C.     Relationship with Party City

68.     Over the last few months, the Debtors' relationship with Party City has become strained, predominantly due to: (i) Party City's failure to repay the Intercompany Promissory Note (ii) Party City's overcharging of the Debtors for tax liabilities and (iii) Party City's threatened rejection of the Anagram-Party City Contracts.  These disputes have dealt significant blows to the Debtor's operating liquidity and debt service capacity, and continue to threaten the Debtors' operations.

#### 1.     Party City Promissory Note

69.     Party City Holdco and Anagram International agreed to the Intercompany Promissory Note in August 2022, prior to Anagram's appointment of the Independent Director. As of the date hereof, Party City has not made any repayments for the $22 million amount outstanding under the Intercompany Promissory Note, and as a result of the Party City Chapter 11 Cases, Anagram expects to receive little or no recovery on account of the Intercompany Promissory Note.

### 2.      Overpayment of Taxes to Party City

70.      Party City pays taxes as a consolidated group that includes Anagram, as a wholly-owned subsidiary.  Historically, pursuant to an undocumented arrangement, Party City would have Anagram reimburse it each tax year an amount equal to the lesser of (i) the amount of taxes that Anagram would have paid for such year had it been an independent tax payer and (ii) the amount actually payable by the entire Party City tax group.  However, on or around March 23, 2023, Party City informed the Debtors that Party City had miscalculated the Debtors' liability under this arrangement for the 2020, 2021 and 2022 tax years.  Specifically, Party City overcharged Anagram by approximately $7 million for those tax years (the "Tax Overpayment") and set off those amounts against amounts owing to the Company pursuant to the Supply Agreement.

71.      The Tax Overpayment placed downward pressure on the Debtors' liquidity, which could have, in turn, triggered cash dominion provisions and other lender rights under the Debtors' funded indebtedness.  More significantly, the Tax Overpayment caused the Debtors to breach certain covenants under its ABL Facility, First Lien Notes and Second Lien Notes, each of which limited the amount of dividends and distributions the Company could make to Party City for the reimbursement of taxes.  On March 30, 2023, the Company notified the ABL Agent, the First Lien Notes Trustee and the Second Lien Notes Trustee of the defaults by delivery of an applicable notice of default.  In April 2023, the Company obtained waivers of the defaults and potential defaults from the ABL Agent and the Ad Hoc Group.

### 3.      Anagram-Party City Contracts

72.      As stated, on May 24, 2023, Party City filed a *Notice of Rejection of Certain Executory Contracts and/or Unexpired Leases* (P.C. Docket No. 1207)[8] (the "Rejection Notice"),

---

[8]      Filings on the docket of the Party City Chapter 11 Cases are cited as "P.C. Docket No."

listing the Anagram-Party City Contracts as contracts to be rejected.  On June 22, 2023, the Anagram Debtors objected to the proposed rejection of the Anagram-Party City Contracts (P.C. Docket No. 1329).

73.     In the months following Party City's filing to reject the Anagram-Party City Contracts, Party City indicated that it wanted to renegotiate the terms of the Anagram-Party City Contracts.  Over the summer of 2023, the Debtors, Party City, and their respective noteholder groups engaged in negotiations (including the exchange of multiple proposals) over the terms of amendments to the Anagram-Party City Contracts.  The parties ultimately reached an agreement in principle, which generally maintained the current relationship between Party City and Anagram, subject to certain contract modifications, while allowing Party City and Anagram to separate their operations in an organized manner, giving each party assurance that the other would continue to perform key services over an agreed time period.  Unfortunately, soon after the parties reached this settlement in principle, Party City unexpectedly reversed course and has not meaningfully engaged in a consensual resolution—thus, resurrecting the possibility that Party City would reject the Anagram-Party City Contracts.

74.     The Rejection Notice is still pending in Party City's Chapter 11 Cases.  Rejection of the Anagram-Party City Contracts would be incredibly detrimental to the Debtors' business. Any interruption in the delivery of essential services to the Debtors would be devastating to the Debtors' operations because the Debtors have not yet completed the transition process.

75.     The Anagram Debtors have paid Party City all amounts due under the Anagram-Party City Contracts in the ordinary course and intend to continue to do so.  To date, the Debtors have not made any progress with Party City on the terms of amended Anagram-Party City Contracts.  Although the Debtors are endeavoring to transition various administrative functions

away from Party City and solidify themselves as a standalone business operation, that process is still ongoing.  At this juncture, rejection of the Anagram-Party City Contracts would have an incredibly detrimental effect on the Debtors' business and impose a material threat to Anagram's ability to continue normal business operations.

### C.    Prepetition Exploration of Restructuring Transactions and Negotiations

76.    Since the beginning of 2023, the Debtors, under the guidance of the Restructuring Committee, have engaged in discussions with the Ad Hoc Group, represented by Milbank LLP as counsel, and Houlihan Lokey Capital, Inc., as financial advisor as well as with the ABL Lenders and other creditors.  The Debtors also engaged with Party City and its advisors, as well as an ad hoc group of holders of Party City's notes (the "PC Noteholder Group") and the PC Noteholder Group's advisors.

77.    In the months prior to the Petition Date, while the Debtors were working to resolve the issues relating to the Anagram-Party City Contracts, the Debtors were also working to address their own capital structure and liquidity needs.  The Debtors and the Ad Hoc Group explored potential restructuring transactions, including a potential transaction involving the equitization of some or all of the Notes.  The negotiations, however, were complicated by the breakdown of negotiations between Party City and Anagram, which created significant uncertainty. Unfortunately, despite extensive negotiations, the parties were unable to reach a resolution on a comprehensive restructuring transaction or a resolution to the issues concerning the Anagram-Party City Contracts.  As a result, the Debtors determined that a sale for all or substantially all of the Debtors' assets was the best path forward, and the Debtors commenced the Sale Process.

### D.    Entry into Forbearance, and Grace Period

78.    Faced with an approximately $6.3 million interest payment due on August 15, 2023, to preserve liquidity, the Restructuring Committee elected to utilize a 30-day grace period and not

make the interest payment (the "Grace Period"). On September 15, 2023, the Grace Period expired, triggering an event of default under the First Lien Notes Indenture. The default, in turn, triggered a cross-default under the ABL Facility and Second Lien Notes.

### E.    Sale and DIP Financing Processes

79.     Prior to the Petition Date, having decided that a sale for substantially all of the Debtors' assets was the optimal path forward, the Debtors, led by Baird, commenced the Sale Process. During this process, Baird approached more than 107 parties, both strategic and financial, in an effort to sell the Company's assets and business. Forty-two (42) interested parties signed non-disclosure agreements and were granted access by Baird to a virtual data room. The virtual data room contained extensive information about the Company, including documents describing the Company's business and assets in considerable detail.

80.     The Debtors and their advisors negotiated the terms of the Stalking Horse Bid with the Stalking Horse Bidder, resulting in the stalking horse asset purchase agreement annexed to the Bidding Procedures. In parallel, the Company continued to encourage other interested parties to compete with the above proposals and to submit indications of interests to purchase the Company's assets.

81.     Simultaneously with the Sale Process, the Debtors and Baird also commenced a process to solicit proposals for debtor-in-possession financing (the "DIP Financing Process") in mid-September, around three weeks prior to the commencement of the Sale Process as explained in the DIP Declaration.[9]

---

[9]     The DIP Financing Process is discussed in further detail in the *Declaration of Ajay Bijoor in Support of Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Postpetition Financing; (B) Use Cash Collateral, and (C) Grant Liens and Superiority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "DIP Declaration") filed contemporaneously herewith in support of the DIP Motion.

**F.      Decision to Commence Chapter 11 Cases**

82.      On November 7, 2023, the Restructuring Committee convened and determined that it was in the best interest of the Company's employees, creditors, and other stakeholders to commence these chapter 11 cases to preserve the value of the business, utilize the DIP Facilities and cash collateral to fund payroll and operations, and allow the Company to continue and finalize the Sale Process to maximize value for the Company's stakeholders. Consequently, the Restructuring Committee authorized the Debtors' chapter 11 filing.

**V.      Evidentiary Support for First Day Motions**

83.      Contemporaneously herewith, the Debtors have filed a number of First Day Motions seeking orders granting various forms of relief intended to stabilize their business operations, facilitate the efficient administration of these chapter 11 cases, and execute a swift and smooth restructuring.  The First Day Pleadings include:

- *Debtors' Emergency Motion Pursuant to Bankruptcy Rule 1015(B) and Local Rule 1015-1 for Order Directing Joint Administration of Chapter 11 Cases*;

- *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "DIP Motion" and the orders entered by the Court pursuant thereto, the "DIP Orders");

- *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms and Books and Records, and (D) Continue to Perform Intercompany Transactions and (II) Granting Related Relief*;

- *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs and (II) Granting Related Relief*;

- *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of (A) Critical Vendors, (B) Lien Claimants, (C) Foreign Vendors, and (D) 503(B)(9) Claimants, (II) Confirming Administrative Expense Priority of Outstanding Orders, and (III) Granting Related Relief;*

- *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Maintain and Administer Their Existing Customer Programs and Honor Certain Prepetition Obligations Related Thereto and (II) Granting Related Relief;*

- *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Taxes and Fees and (II) Granting Related Relief;*

- *Debtors' Emergency Motion for Entry of an Order (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers From Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Additional Assurance Requests, and (IV) Granting Related Relief;*

- *Emergency Ex Parte Application for Entry of an Order Authorizing the Employment and Retention of Kurtzman Carson Consultants LLC as Claims, Noticing and Solicitation Agent; and*

- *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Prepetition Insurance Coverage and Satisfy Prepetition Obligations Related Thereto, (B) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies, and (C) Maintain Their Surety Bond Program, and (II) Granting Related Relief.*

84.     The First Day Motions seek authority to, among other things, obtain post-petition financing, honor employee-related wages and benefits obligations, pay claims of certain critical vendors and suppliers, and ensure the continuation of the Debtors' cash management system and other operations in the ordinary course of business with as minimal interruption as possible on account of the commencement of these chapter 11 cases.  In my capacity as CRO, and based on my experience and knowledge, I believe that the relief requested in the First Day Motions is necessary to provide the Debtors an opportunity to work towards a successful restructuring that will inure to the benefit of each stakeholder.

85.     Several of the First Day Motions request authority to pay certain prepetition claims against the Debtors.  The Debtors have narrowly tailored these requests for immediate authority to pay certain prepetition claims to those instances where the failure to pay would cause immediate and irreparable harm to the Debtors and their estates.  The Debtors will defer seeking other relief to subsequent hearings before the Court.

86.     I am familiar with the content and substance of each of the First Day Motions and hereby reference and expressly incorporate into this Declaration the facts in each First Day Motion with the exception of certain of the sections of the DIP Motion, which rely on the DIP Declaration. In my capacity as CRO, and based on my experience and knowledge, I believe approval of the relief sought in each of the First Day Motions is critical to the Debtors' ability to successfully implement their chapter 11 strategy, with minimal disruption to their business operations. Obtaining the relief sought in the First Day Motions will permit the Debtors to preserve and maximize the value of their estates for the benefit of all of their stakeholders.

[*Remainder of page intentionally left blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.


Dated: November 8, 2023

/s/   Adrian Frankum
Adrian Frankum
Chief Restructuring Officer
Anagram Holdings, LLC, *et al*.